We'll move now to case number four for the day, Tran v. Minnesota Life Insurance Company. This is appeal number 18-1723. First for the appellant, Ms. Herring. Good morning, your honors. May it please the court. My name is Jacqueline Herring and I represent the appellant, Minnesota Life Insurance Company. This is an ERISA accidental death benefits claim that was decided by the district court on de novo review under Rule 52 based on a stipulated administrative record. The district court found in favor of the plaintiff, LeTran Tran, finding that the insured Lino Lenos' death from autoerotic asphyxiation was a covered accidental death under the terms of the narrow coverage provided by the ERISA plan in this case. Mr. Lenos hung himself in the basement of his home. He wrapped a rope around his neck, tied the other end to a ceiling beam in the basement, stepped off a stool, and hung himself suspended above the floor. The coroner found that his death was the result of autoerotic asphyxiation and the parties agree on that. There's no court committed multiple errors in finding that coverage exists in this particular case and should be reversed. First, the district court misconstrued the terms of the plan and relieved plaintiff of a burden of proving coverage. The plan specifically limits accidental death coverage as defined to death that results from accidental injury that is unexpected and unforeseen. The district court, however, when Minnesota Life properly acknowledged that this was not a suicide, everybody agreed it was autoerotic asphyxiation, when Minnesota Life acknowledged that it was not a suicide, the district court took that as an admission that because death was not intended, death, therefore, was accidental, and injury underlying the death was also accidental. So the court conflated all of these different concepts and thereby relieved plaintiff of a burden of proving coverage. In fact, the district court says in its opinion that the only issue is whether an exclusion applies. So the court completely bypassed the threshold coverage decision on which plaintiff bears the burden of proof. As I understand your argument on that, on the rider, it's that the definition of accidental that's contained in the rider wasn't stipulated to, but the fact of how he died was. Is that correct? That is correct, your honor. Accidental death is specifically defined in the plan. It requires that death result from an accidental injury which is unexpected and unforeseen. What we stipulated to, again, was the administrative record. And what the coroner found, and again what the parties agreed, was that this was an autoerotic asphyxiation. And so acknowledging that Mr. Lenos didn't intend to cause his death is not the same as saying that that is an accidental death. It's not a binary concept. It doesn't fall into one bin or the other, either an intentional death or an accidental death. And that's been recognized by courts, including this one, in the context of, for example, drunk driving, where a death that was a foreseeable event and therefore not a covered accident. That would include skiing, I assume. That would include, I'm sorry? Skiing, I would assume. Skiing while drunk? Probably, your honor. No, skiing while sober as a judge. Yeah, that one. I don't know if skiing is one of the many principal occupations of the judiciary, but if you're skiing and you run into a tree, it's not unusual. As a matter of fact, it's one of the hazards. One of the things that makes it thrilling. Well, there's a couple distinctions. With the Autoerotic Asphyxiation Act, the act is inherently injurious. When the court is skiing, that is an activity that when normally performed is not an inherently injurious activity. It is not possible to perform autoerotic asphyxiation without causing injury. The entire purpose of the act is to choke oneself, deprive the brain of oxygen. One recovers from that fairly rapidly. One can recover from that. Yeah, that's what his attempt was. The temporary nature of an injury, though, does not negate the fact that it's an injury. Again, if I were to strangle somebody else, stop short of death, and say, oh, but you're going to recover, I'm not off the hook for causing an injury. Because an injury still occurred. And the same thing happens here. But part of the problem with that inquiry is the district judge never made those decisions. He completely bypassed the issue of coverage on which Tran bears the burden to establish that there was an injury that was unexpected and unforeseen. If we end up agreeing with you with regard to injury on the exclusion, you make alternative arguments. You make the argument that there should be remand for facts to be found or outright we could rule as a matter of law. If the case were to be remanded, what type of facts would the parties gather and present to the court at trial? I don't think there would necessarily need to be any additional facts. Again, this was a stipulated record. The problem was the district court did not do that fact finding. And specifically with respect to the exclusion, the district court mentioned multiple times that reasonable people could disagree. Reasonable people could disagree. Well, that's not a fact finding. If we are in a murder trial and the jury is a hung jury, we don't say, oh, well, reasonable people could disagree, and therefore we're either going to sentence him or not. There has to be that underlying fact finding. The facts were available to the district court to make those findings based on the stipulated record, but the district court simply did not do so. You're saying he went to contra preferentum too quickly. He went to contra preferentum not just too quickly, but on an issue on which the doctrine doesn't apply. Contra preferentum is a doctrine to interpret ambiguous policy language. It is not a doctrine that's used to make a fact finding. Well, let's focus on the exclusion then, if we may, because that's my problem. To cut off your oxygen and your blood flow with this mechanism in order for this process to work, I would look at that as an injury. When you do that to yourself, it's necessary to injure yourself by cutting off oxygen and blood flow in order for this process to succeed. And if that's an injury, it's an intentional injury. Now, obviously, they're going to argue the other way, but maybe you can expound on that. Absolutely, Your Honor. Of course, we fully agree with that assessment. And not only is it an intentional injury, but it is clearly a self-inflicted injury. There's no question here that Mr. Lenos died by his own hand. And the injuries that he was inflicting are clearly laid out in the record through the opinions of Dr. Chaplin. And so he is intentionally choking himself. And again, he's suspended above the floor. So he's fully suspended. He didn't intend to kill himself. We don't have evidence that he intended to kill himself, Your Honor. And again, everybody has agreed that it was autoerotic asphyxiation. But again, an unintended death doesn't inherently mean the opposite. Therefore, it's an accidental death. There still has to be satisfaction of the plan-specific time. Thank you, Your Honor. Mr. Skafish. Thank you. May it please the Court, Counsel, Brad Skafish, on behalf of the appellee, LeTran Tran. As we know, on August 9, 2016, Giappelli lost her husband, Leno Lenos, in what was a terrible accident while he was performing what we have all learned to be autoerotic asphyxiation. I think if there's one point that I made while I was standing here right now, as opposed to anything, it is that what he intended to do simply was not an injury. What he intended to do would have provided him gratification, momentary loss of oxygen, and he would have survived the act with no harm whatsoever. It's not an injury pursuant to the case law, pursuant to the science that's contained within the administrative record, or pursuant to common sense. Simply, the district court Judge Dow presiding made the right decision. Why? This was an accidental death. As the decision discusses under the Santayella decision, which was a Seventh Circuit case, what does accidental mean? It means unexpected or unintentional. It's the plain meaning of the term. I think a lot of what we've gotten into has to do with the mental gymnastics that the insurance company puts us through by attempting to define accidental as something other than the plain meaning of the term accidental. Nevertheless, despite the fact that they say that the court didn't entertain whether it was an accidental injury, the court certainly did do so. The court goes through several pages in the decision analyzing under the Santayella decision that for an injury resulting in death to be accidental, it has to have been subjectively accidental, meaning not intended. In fact, the Santayella case goes as far as saying if you determine that the death was accidental from the subjective viewpoint of the insured, you really don't even have to get to the second prong of that test, the objective. Now, often because the person ultimately dies, it's hard to define what their subjective intent was. Here, there's a lot of evidence that would go to determining what his subjective intent was. As found by the medical examiner, the towel wrapped around the decedent's neck. It's an indication that he was trying not to leave marks on himself, something one would do if they expect to survive the act, not if they're suicidal or don't care one way or the other whether they survive. The pubic shavings and the rubber rings that the examiner found were evidence that led to a reasonable inference that this person had engaged in this act before. The stool, the release mechanism, and the rope. Obviously, those things failed, but they were there so that Mr. Llanos could attempt to survive the act that he was involved in. Now, moving on to the second prong, if in fact you need to get there, it's did he expect to survive it? Was that subjective expectation reasonable to an objective, reasonable person? Again, it's not would an objective, reasonable person do this same act to him or herself. It's would they find Mr. Llanos' subjective expectation reasonable. And the court says under the Santayella holding, which also includes language from Padfield, that you can't say that what was intended to occur, that the death was intended, even under the articulation put forth by the defense, unless it was substantially certain to result. Now, the defense has said, well, that means unless you intended death, it's going to be covered. Again, that's not really what the case law has held. There are several cases that have addressed this. Santayella, as we know, is a Seventh Circuit case that talks about whether death is accidental or not, and it was in the context of an accidental death that came from abuse of a prescription drug. But we have from other circuits a lot of very good persuasive law from the Ninth Circuit and the Second Circuit in cases that were almost identical on the facts. How about with regard to the policy, though? Because obviously it's Padfield and Critchlow. Padfield and Critchlow are on point. And you're making the argument that it's analogous on the facts. How about, though, with regard to the terminology of the exclusion? Is that the same? I didn't see anything in the analysis within Padfield and Critchlow and the court's analysis of the policy at issue here that would suggest that they should be handled otherwise. The language is very similar. They refer to accidental death and then exclusions on the basis of intentional self-injury, intent to injure oneself. And that's where you get into whether or not it was an injury. And you go back to the cases, including Critchlow and Padfield. I think one of the most important points on Critchlow, the court said, absent an accident, this practice, meaning autoerotic asphyxiation, is not injurious. It creates temporary lightheadedness and euphoria with no serious or lasting effects on the health. The Padfield case, the court held the likelihood of death from autoerotic asphyxiation falls far short of what would be required to negate coverage, and in fact went on to say, in quotes, Well, and here we get into their strong dissents in each case. Judge Van Graafelen, in the Second Circuit case, was very strong that he disagreed with that conclusion. Let me ask you to respond to an argument that Ms. Haring raised in the briefs, which is, let's assume on this whole first step with regard to the rider, that there was the stipulation, there was the determination made by the court, then Judge Dow immediately went to the second part of the analysis, the exclusion. The application of contraprofarentum in those circumstances didn't apply just to the word accident, but also applied to the exclusion itself. Are there certain terms within the exclusion that you think are ambiguous, such that contraprofarentum should apply? Well, yes, arguably, and to make it clear, I think a proper reading of the court's decision is that they found that the exclusion did not apply, but they did in the dicta explain, perhaps reasonable minds could disagree on this, in which case, if that's where we get, you get to contraprofarentum. But yes, the very term injury, and I think that's what we've come back to, as Your Honor said, would skiing be an intent to injure oneself? Would skydiving, would sailing, would motorcycle riding? Using counsel's example, she said if she came up to somebody and strangled them, but they recovered, then she's not off the hook. But the difference is the lack of consent on the person receiving that. Let's take an example where someone decides to get a tattoo. Very common in our society these days. They're undergoing intentionally hundreds, if not thousands, of deliberate traumas to their body for something that they value, which may not be valued by others, but they're getting the result they want. However, were that to go wrong and infection were to result and there were to be a death or dismemberment, it clearly would not be the expectation subjectively or objectively of the person undergoing that particular event that injury was likely to result. That's brought up in our initial letter appealing the decision by the insurance company. It's brought up in Judge Dow's decision. It's brought up in some of the other cases. A couple other points I'd like to get to. I know my time is running short. I want to get back to that one, so go ahead. In the briefs, the defense cites to other activities such as Russian roulette and tries to make the analogy that this is simply the same as Russian roulette, where chances are you'll survive, but if you don't, it can't really be said that death wasn't intentional or injury wasn't intended because it was foreseeable. I think that's flipping the burden to the other extreme, where if you can conceive of a situation where somebody would die, you're saying that's foreseeable and thus it's not covered. There's a huge difference between autoerotic asphyxiation and Russian roulette. The participant in the asphyxiation intends gratification. They are not trying to put themselves in harm's way. The person who engages in Russian roulette, and this is quoting some language from the Stamp case, which was in the defense brief, they're deliberately courting death. There's nothing else that the practitioner of Russian roulette is trying to do other than court death itself for a thrill. They're not trying to get some other form of gratification or enjoyment. There's no social utility. That's something else that's also brought up in the Stamp decision, which is why the drunk driving isn't quite on point. The drunk driver is doing something with a negative social utility to himself and others as opposed to the practitioner of autoerotic asphyxiation who is simply trying to obtain some sort of personal gratification with no risk to anybody else and an extremely limited risk to him or herself. It just becomes of record once something goes wrong. Well, that gets back to where we were, and that is the actual what he did. The two acts, I don't know exactly how it works, but you do cut off oxygen and blood flow. Those look to me like they are injuries and that you purposely injure it in order for this whole thing to come out. Look, I used to train horses. Every time you get on a green horse, there's a good chance you're going to end up on the ground or something. That's a risk, but it's one that you can control, etc. This risk, to me at least, looks like it's serious. You're injuring yourself to do something. A Russian roulette, you know, okay. When you talk about sports and other things that take a risk, those are prone to accidents. You can have something, but this one to me seems within the exclusion to say that was an intentional injury. Otherwise, this whole thing won't work. Now, maybe that's where reasonable people can disagree. Well, may I respond to that? Yeah, because that's where I want you to respond to that. Right. I would look outside of our own case to the holding in Critchlaw where the court held temporary lightheadedness and euphoria with no serious or lasting effects on health is what should normally happen. No lasting effects. You're just lightheaded, euphoric, the same as somebody who's consumed alcohol. It's not something where doing it correctly causes any injury or harm to your health. In fact, maybe taking that a step further, I would argue that if, in fact, at any point some injury occurs, then the intent of the autoerotic asphyxiation participant has been thwarted because it means they black out and they don't get the sensation that they were seeking. You're saying that's not an injury. That holding one's breath or restricting blood flow temporarily is not an injury. Not holding, I don't know. I don't understand how this whole thing works. It's using a device to keep the blood flow from bringing oxygen to the brain. Yeah, and so you just say, well, that's just a process and it's not an injury or something. And that's where I'm, it looks like it's like a self-inflicted injury. It's not, it doesn't have to be fatal if it works, et cetera. But that seems to be what happened, that he either disabled himself sufficiently or he couldn't disengage or do whatever he was supposed to do instead of, he didn't even fall off the stool. He's got about one foot on the stool while he's suspended. It's a horrible thing. It's really sad. And I know he waits until, I guess, the family is gone. He's there by himself and there's no rescue available. Well, that's my point. And that's why I think the exclusion controls his case. Just a final on that was where I would disagree is that had he accomplished what he wanted, he never would have lost consciousness. He would have maintained control the whole time. What's the source of your quote? I'm sorry? What's the source of your quote? Where I said that the only results should have been temporary lightheadedness and euphoria, that's from the Critchlow decision, the Second Circuit decision on this issue. Finally, I would just like to point out, as we say in our brief, if you believe that the court reached the right decision, because some of the arguments that were made were, I would say, in the nature of procedural, attacking the language used by Judge Down, his decision, if you find under the wealth of other case law that the decision was correct, then, of course, it must be affirmed under American National Bank and Trust. With that, I would thank the panel for its time and ask that the decision of the lower court be affirmed. Thank you, Mr. Skafish. Ms. Herring, rebuttal. No one who observed what Mr. Lanos was about to do in his basement would have closed the basement door, walked away, and said, no injury is about to happen here. The distinction, one of many distinctions with Critchlow, in Critchlow, not only was there expert testimony, but there were specific, this guy had an elaborately designed mechanism in Critchlow, and his mechanism was specifically designed such that if he passed out, it would automatically disengage. What Mr. Lanos did was the exact opposite. If he were to pass out, he would have absolutely no way of recovery. This was an intentional shutting down of his vital bodily functions in order to provoke the body's neurochemical response to shutting down of those functions, which he experienced as euphoria. But there is still an injury that has to occur before you get to that place. Let me ask you, if we end up agreeing with that position, are we contrary to the Second and Ninth Circuits? Are we creating a split by doing so? No, Your Honor, because, again, it's similar to the drunk driving context. There may be certain drunk driving incidents that are accidental. There may be others that are not. The factual scenarios were different in Padfield, Critchlow, and Todd, and the language of the policies was different. Our particular policy defines an accidental death. It defines an accidental death as death that results from an injury that is unexpected and unforeseen. So even with the application of the subjective objective analysis, that analysis has to be applied to the injury, not to the death. That test is applied to the death when there's no further definition and the court is left to try to figure out what's an accidental death. What's unexpected when you say it's unexpected and unforeseen? Because I think his passing out or whatever he do of cutting off the oxygen and the blood circulation, that's expected, isn't it? Absolutely, and that's why it is not even within coverage and we don't even need to reach the exclusion. To establish coverage, plaintiff has to show that death resulted from an injury that was unexpected and unforeseen. Because this was an expected injury, it falls outside of coverage and also would be excluded even if it were within coverage. But then the question is, disagreement may come of whether that is or is not an injury, and that's where I am. That's my problem. I think it's an injury, but it's also expected. It is an expected injury, and it's similar to, for me, it's similar to the emotional cutters. They're cutting themselves not to kill themselves, but they're definitely inflicting an injury to release the emotional pain. This guy is deliberately inflicting an injury to provoke the response, release the neurochemical body responses to that trauma, the endorphins, and that's where the euphoria comes from. It's absolutely an expected injury, it was a self-inflicted injury, and it is a death that is not covered by this policy. Thank you. Thank you to both counsel for your argument, and the case will be taken under advisement.